# United States Court of Appeals
## For the First Circuit

No. 18-1333

UNITED STATES OF AMERICA,

Appellee,

v.

RAFAEL LEONER-AGUIRRE, a/k/a Tremendo,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Lynch, Selya, and Barron,
Circuit Judges.

Julia Pamela Heit for appellant.
Kunal Pasricha, Assistant United States Attorney, with whom
Andrew E. Lelling, United States Attorney, was on brief, for
appellee.

September 20, 2019

**LYNCH**, **Circuit Judge**.  After a two-week trial, a jury in 2017 convicted Rafael Leoner-Aguirre ("Aguirre"), a leader of the MS-13 gang in Massachusetts, of RICO conspiracy, 18 U.S.C. § 1962(d).  The predicate acts charged involved murder, robbery, and drug dealing.  The district court sentenced Aguirre to 228 months' imprisonment and three years of supervised release.

He appeals from his conviction.  Aguirre first argues that the district court erred when it instructed the jury on the requirements to convict him for RICO conspiracy.  He argues that the district court erred by not following a statement of the law contained in United States v. Ramírez-Rivera, 800 F.3d 1, 18 (1st Cir. 2015).  We hold that the district court was correct to reject this instruction under Salinas v. United States, 522 U.S. 52 (1997), and United States v. Cianci, 378 F.3d 71 (1st Cir. 2004).  Aguirre more generally challenges the jury instructions for failing to require the jury to make an affirmative finding, in the verdict, as to which predicate acts he and his co-conspirators in fact committed.  We reject this argument as well for being inconsistent with Salinas.

Further, he argues that the evidence did not negate his affirmative defense that he withdrew from the conspiracy when he was imprisoned.  Though he did not so object at trial, he now argues that the district court erred when it instructed the jury on the requirements of a withdrawal defense.  Again, case law from

- 2 -

the Supreme Court, Smith v. United States, 568 U.S. 106 (2013), and this circuit forecloses his argument. Finally, he makes several meritless challenges to the admission of certain testimony. We affirm his conviction.

## I.

We state the facts in the light most favorable to the jury's verdict. United States v. Ciresi, 697 F.3d 19, 23 (1st Cir. 2012). The indictment arose from the defendant's activities as a high-ranking member of the Mara Salvatrucha gang, MS-13. MS-13, based in El Salvador and also operating in the United States, is composed of subgroups called "cliques." The "Enfermos" clique operates in El Salvador and Massachusetts.

Around 2012, the Enfermos paid for Aguirre to come to the United States. Aguirre arrived in Michigan, and while he lived there, he created promotional videos for MS-13 to attract new members that touted the gang's mission of killing rivals. In 2014, Aguirre went to Massachusetts with the goal of enlarging the clique, and became its highest-ranking member. He was the "palabrero," the local leader of the Enfermos, and began overseeing the activities of Enfermos members, including by taking control of promotions within the clique, recruiting new members, and disciplining members who broke clique rules. Aguirre also ordered clique members to commit a number of crimes, including robberies, beatings, and murders.

Aguirre also directly participated in three attempted murders, either personally or by ordering the murder be committed by other MS-13 members. The first was on April 6, 2014, and began when Aguirre recognized two rival gang members walking toward him and his girlfriend. Aguirre approached the men and attacked one of them with a machete. The victim defended himself with a box-opening knife. Aguirre struck the victim in the arm and the head with the machete and said, "La Mara Salvatrucha." The victim was hospitalized and lived. He testified at trial about the attack and identified Aguirre as his attacker.

The second murder attempt took place on April 16, 2014, after Aguirre learned that rivals had attacked two Enfermos members. Seeking revenge, Aguirre and three other Enfermos members set out to find the rivals, and spotted Javier Servellon and his friend. A fight ensued; Servellon tried to defend his friend; Aguirre aimed a gun at Servellon and shot him as he tried to run away. Again, the victim was hospitalized and survived. Aguirre was arrested on state charges and a jury, in 2015, convicted him of assault with intent to kill.[1]

The third attempt was while Aguirre was in state prison on his assault conviction. He remained the leader of the Enfermos

---

[1] Aguirre's former girlfriend also witnessed this fight. She stated that she stayed in the car while the fight took place. She heard a gunshot during the fight and, when Aguirre returned, he stated he shot a man but did not know if he was dead.

while in prison. He ordered the Enfermos to kill Christian Henriquez, a fellow Enfermos member, suspected of betraying the clique. Daniel Menjivar, an Enfermos member, was recorded as saying that Aguirre gave the order to kill Henriquez. Henriquez also testified at trial that Menjivar had told him that Aguirre gave "the green light" for Henriquez to be killed. Other recordings captured Enfermos members discussing how to kill Henriquez. By April 2015, law enforcement had uncovered the plan and warned Henriquez, who avoided harm.

Aguirre also personally committed multiple armed robberies using a machete and a gun from March 2014 until his arrest in April 2014. Further, an Enfermos member also gave Aguirre money from drug sales. Aguirre used the money to buy weapons and send money back to El Salvador.

In May 2017, a grand jury indicted Aguirre for RICO conspiracy in violation of 18 U.S.C. § 1962(d). Specifically, the indictment charged that Aguirre was "employed by and associated with MS-13, an enterprise which was engaged in, and the activities of which affected, interstate and foreign commerce." It charged that he "did knowingly conspire with [his co-defendants and other persons] to violate [18 U.S.C. § 1962(c)], that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the MS-13 enterprise through a pattern of racketeering activity." The indictment further charged "that each defendant

agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the MS-13 enterprise." The indictment alleged that the pattern of racketeering activity included "multiple offenses involving trafficking in narcotics, including . . . marijuana," "multiple acts involving murder," and "multiple acts involving robbery." The indictment named Aguirre as a participant in three attempted murders and alleged that other MS-13 members committed six murders. He was charged with RICO conspiracy; not substantive RICO offenses. As said, he was convicted of the one RICO conspiracy count charged.

II.

We first address Aguirre's challenges to the jury instructions on the elements of RICO conspiracy given at trial. Then we review his arguments about his defense of withdrawal from the conspiracy and the standards for showing withdrawal. Finally, we address the evidentiary issues he raises.

A. Jury Instructions for RICO Conspiracy

Before addressing Aguirre's challenges, we first recount the procedural history of his requests to the district court that the jury be instructed to make certain findings in order to convict him of RICO conspiracy. The nature of his request has evolved over time, and his briefing is unclear as to which request is at issue.

We begin with his first motion, made before his trial

began, in which Aguirre requested "that the issue of whether he conspired to commit or further the crime of attempted murder not be considered at sentencing unless submitted to the jury as a RICO predicate offense, and absent a jury's affirmative finding using a reasonable doubt standard." The government opposed this motion as inconsistent with RICO conspiracy law, and the district court denied the request.

On October 27, 2017, at the final pretrial conference, Aguirre raised the question of what a jury must find to convict for RICO conspiracy. His counsel asked, "how exactly [will] we know what the jury found with respect to" the defense's arguments that the crimes Aguirre committed were not predicate acts "if all they're asked to do is come back and say, yeah, there's two predicate offenses, and we don't know which ones they are, we don't have to specify whether they're the attempted murders or the armed robberies or anything else." The government again opposed Aguirre's arguments, and the district court stated that it would not make a final ruling on jury instructions yet.

On November 17, 2017, the district court held the charge conference. The next day, Aguirre filed a supplemental proposed jury instruction that requested "an instruction that explicitly follows the elements of a RICO conspiracy charge as stated in United States v. Ramírez-Rivera." Ramírez-Rivera stated that for a defendant to be convicted of RICO conspiracy, the government

must prove, among other elements, that he "participated in the conduct of the affairs of the enterprise . . . through a pattern of racketeering activity by agreeing to commit, or in fact committing, two or more predicate offenses." Ramírez-Rivera, 800 F.3d at 18. In so stating, Ramírez-Rivera relied on United States v. Shifman, 124 F.3d 31, 35 (1st Cir. 1997). Ramírez-Rivera, 800 F.3d at 18. But Shifman had been abrogated in this regard by Salinas. See Salinas, 522 U.S. at 65. In its brief to the Ramírez-Rivera panel, the government never argued that Shifman had been abrogated by Salinas. It also failed to respond to the defendants' contention that the First Circuit requires "that [defendants] personally agree to commit two or more racketeering acts," which cited pre-Salinas case law for support.[2]

On the first day of trial, the district court addressed

---

[2] Not at issue on appeal is Aguirre's second request of an instruction on the elements of certain crimes that do not constitute "racketeering activity." Aguirre refers to these offenses as "lesser included" crimes. The district court agreed to and did instruct on three crimes that are not "racketeering activity" under the statute: voluntary manslaughter, involuntary manslaughter, and the state crime of armed assault with intent to kill. The district court prefaced this instruction by telling the jury that it would hear instructions "on the definitions of certain related crimes that are not racketeering acts to try to give [it] a reasonably clear picture of what the law requires." After instructing on the elements of crimes that constitute racketeering activity, the district court also told the jury that the next set of crimes "do not qualify as 'racketeering acts,'" and instructed on the elements of these three nonracketeering crimes and on how self-defense can mitigate the seriousness of a crime. The prosecution did not object.

Aguirre's request in the supplement.  The district court noted

that Ramírez-Rivera "appears to conflict with [Salinas]" on the

elements of RICO conspiracy.  The district court then stated:

> I think I have to conclude through
> inadvertence or mistake that the First Circuit
> in 2015 misstated what the relevant elements
> were and that, again, because it has been
> overruled by Salinas, the government need not
> prove that the defendant agreed to commit or,
> in fact, committed two predicate
> . . . offenses, and my jury instructions and
> the course of trial will reflect that.

At the close of trial, the district court instructed the jury that

"[t]he government is not required to prove either that the

defendant personally agreed to commit two racketeering acts or

that he actually committed two such acts."

The district court then properly instructed that the

indictment alleged these predicate acts: "murder, assault with

intent to commit murder, armed assault with intent to murder[,]

conspiracy to commit murder, armed robbery, armed assault with

intent to rob, and criminal offenses involving trafficking in

narcotics,"[3] and explained the elements of some of these offenses.

The district court also instructed that the jury "must unanimously

agree on which type or types of racketeering activity that the

defendant agreed the enterprise would conduct -- for example, at

---

[3] The two "criminal offenses involving trafficking in narcotics" charges were "to conspire to distribute control[led] substances, including marijuana, or to possess such substances with the intent to distribute."

- 9 -

least two acts of murder, at least two acts of robbery, or at least two acts of narcotics trafficking, or all of them, or any combination of them." (Emphasis added). At the close of the instructions, Aguirre preserved his objection to the denial of the Ramírez-Rivera instruction.

Aguirre argues on appeal that the district court erred when it refused to require the jury to "set forth the predicate acts . . . which they found that Aguirre committed or conspired to commit" because the district court was "obliged to follow" Ramírez-Rivera.[4] A challenge to a refused jury instruction succeeds only when "the requested instruction was (1) substantively correct; (2) not substantially covered elsewhere in the charge; and (3) concerned a sufficiently important point that the failure to give it seriously impaired the defendant's ability to present his or her defense." United States v. Prigmore, 243 F.3d 1, 17 (1st Cir. 2001). His challenge fails on the first prong, as we explain below, because the statement he relies on from Ramírez-Rivera was incorrect and inconsistent with Salinas.

Aguirre makes a separate argument that the government's decision to prove his agreement to a RICO conspiracy by introducing

_____

[4] To the extent that Aguirre's argument on appeal is that the district court erred by denying his request to instruct the jury on the elements of RICO conspiracy as stated in Ramírez-Rivera, Aguirre preserved this objection, so our review is de novo. United States v. Galatis, 849 F.3d 455, 463 (1st Cir. 2017).

evidence that he and his co-conspirators in fact committed multiple acts of racketeering triggered a "concomitant obligation to charge the jury to make a finding concerning which predicate acts it found that Aguirre or others committed beyond a reasonable doubt." Aguirre argues that this instruction was "necessary" to his defense strategy, which focused on arguing that the crimes he and his co-conspirators committed were what he calls "lesser included" offenses, and not predicate acts that constitute racketeering activity under the statute. Without an express jury finding on which predicate acts were committed, Aguirre argues there is no way to know if the jury found that the crimes he and his co-conspirators committed were predicate acts or "lesser included" offenses. Aguirre did not submit any proposed jury instruction along these lines at trial, so our review of this argument is for plain error. We find no error in the district court's instructions.

Aguirre's challenges are based on a misunderstanding of RICO conspiracy law. The RICO statute's conspiracy provision makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). Subsection (c), which Aguirre was charged with conspiring to violate, prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or

- 11 -

participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  Id. § 1962(c).  Relevant here, "racketeering activity," composed of predicate acts, includes "any act or threat involving murder, . . . robbery, . . . or dealing in a controlled substance."  Id. § 1961(1)(A).  A pattern of racketeering activity "requires at least two acts of racketeering activity" within ten years of each other.  Id. § 1961(5).

The government's burden in proving a violation of the conspiracy offense, section 1962(d), is to show that the defendant "knew about and agreed to facilitate" a substantive RICO violation. Salinas, 522 U.S. at 66.  So, conspiracy to violate subsection (c) requires proof that the defendant knew about and agreed to facilitate "the conduct of [an] enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c); see also Salinas, 522 U.S. at 62 (stating that the "predominant" elements of a subsection (c) violation are "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity").

In Salinas, the Supreme Court made clear that the government does not need to prove that the defendant "himself commit[ted] or agree[d] to commit the two or more predicate acts requisite to the underlying offense."  Salinas, 522 U.S. at 65; see Cianci, 378 F.3d at 90 (quoting Salinas, 522 U.S. at 61-66).

Nor must the government prove that the defendant or his

- 12 -

co-conspirators committed any overt act in furtherance of the conspiracy. Salinas, 522 U.S. at 63. It follows that the government's burden, as to the "pattern of racketeering activity" requirement for a RICO conspiracy violation, is to prove that the defendant agreed that at least two acts of racketeering would be committed in furtherance of the conspiracy. See id. at 65 ("One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense.").

We turn to Aguirre's argument that the district court was "obliged to follow" Ramírez-Rivera. The district court correctly noted that Ramírez-Rivera quotes the Shifman, pre-Salinas requirement for RICO conspiracy that the government prove that the defendant committed or agreed to commit the predicate acts. Ramírez-Rivera, 800 F.3d at 18. Shifman was decided four months before Salinas. We agree with the district court that Salinas controls, and not the language from Ramírez-Rivera.[5] Our recent decision in United States v. Rivera-Carrasquillo, 933 F.3d 33 (1st Cir. 2019), originally quoted the same pre-Salinas requirement as Ramírez-Rivera. But that error was eliminated when the court, within a few days, issued an errata sheet removing this

--------

[5]    Our precedent on the elements of RICO conspiracy has at times been muddled. The district court's rejection of the proposed instruction comported with other binding First Circuit authority faithfully applying Salinas. See, e.g., Cianci, 378 F.3d at 90. Under these circumstances, the district court did not err by declining to give Aguirre's proposed instruction.

- 13 -

language.  Id. at 47.  So, Aguirre's requested instruction was contrary to Salinas, and the district court quite properly rejected it.

As to Aguirre's separate argument that, given the government's method of proof, the district court should have required the jury to make an affirmative finding as to the predicate acts he or his co-conspirators in fact committed, we see no error in what the district court did because this request is not required by Salinas.  The government's decision to prove the fact of Aguirre's conspiracy agreement in part with evidence that he and his co-conspirators in fact intended to and did commit at least two of the types of racketeering activity does not change the fact that conviction of RICO conspiracy does not require proof that the defendant himself, or his co-conspirators, in fact committed the racketeering activity.  Aguirre's argument about "lesser included" offenses is similarly misguided because it does not matter whether he committed an act of racketeering or a "lesser included" offense,[6] so long as what he conspired to were predicate acts, such as "any act or threat involving murder."  18 U.S.C. § 1961(1)(A).  The conspiratorial agreement is what matters.

---

[6]    Even if Aguirre could prove that the crimes he committed or ordered were "lesser included" offenses, the jury still could conclude the commission of "lesser included" offenses was evidence that Aguirre agreed that a pattern of racketeering activity would be committed.

- 14 -

For these reasons, there was no error.[7]  We add that there was, in any event, more than abundant evidence that all of the charged types of offenses committed were predicate acts, as well as that he joined the conspiracy charged.

B.   Alleged Withdrawal from the Conspiracy

Aguirre next argues that he withdrew from the conspiracy upon his arrest, and so no post-arrest predicate act could be attributed to him.  To preserve a challenge to the sufficiency of the evidence, the defendant must "mov[e] for an acquittal at the close of the defense's evidence at trial."  United States v. Van Horn, 277 F.3d 48, 54 (1st Cir. 2002).  Aguirre renewed his motion for judgment of acquittal at the close of evidence, so this challenge is preserved.

He further argues, for the first time on appeal, that placing the burden on a defendant to prove withdrawal from a conspiracy, as the district court instructed, is "constitutionally

---

[7]    To the extent that Aguirre may be attempting to argue that it was error for the district court to refer to types of racketeering in its instruction, rather than precise acts, we reject this argument.  See, e.g., United States v. Applins, 637 F.3d 59, 80-82 (2d Cir. 2011) (concluding that a district court's instruction, which stated that the jury "must be unanimous as to which type or types of predicate racketeering activity the defendant agreed would be committed," was not error and that "a finding of specific predicate acts" was not required (emphasis omitted)).

- 15 -

deficient."[8]  Review of that issue is for plain error.[9]

As to Aguirre's first challenge, we review preserved challenges to the sufficiency of the evidence by asking "whether, taking the evidence in the light most favorable to the jury's verdict, a rational jury could have found the defendant guilty beyond a reasonable doubt."  United States v. Hicks, 575 F.3d 130, 139 (1st Cir. 2009).  For purposes of this withdrawal argument, Aguirre does not dispute that he joined the conspiracy.  The law is clear that "a defendant's membership in the ongoing unlawful scheme continues until he withdraws."  Smith, 568 U.S. at 107.  The burden is on a defendant to prove the affirmative defense of withdrawal.  Id. at 112.  To withdraw, "a conspirator must act affirmatively either to defeat or disavow the purposes of the conspiracy."  United States v. Juodakis, 834 F.2d 1099, 1102 (1st Cir. 1987) (per curiam).

We flatly reject as a matter of law the argument that

---

[8]    Aguirre asserts this requirement is unconstitutional because it is "comparable to a nearly irrevocable presumption" that the Supreme Court has rejected in other contexts.  He says this "presumption of the continuing conspiracy must be regarded as irrational or arbitrary and cannot survive constitutional scrutiny."  (Internal quotation marks omitted).

[9]    Aguirre objected at the close of the jury instructions to "the failure to use the withdrawal instruction."  At the charge conference, Aguirre requested the inclusion of this statement in the jury instructions: "Whether or not the arrest and incarceration of a conspirator constitutes withdrawal may be determined by the facts of the case."  This is not the same challenge Aguirre makes on appeal.

- 16 -

Aguirre's arrest and imprisonment necessarily constituted his withdrawal from the conspiracy. Imprisonment alone does not satisfy a defendant's burden of proving withdrawal. See, e.g., United States v. Pizarro-Berríos, 448 F.3d 1, 10 (1st Cir. 2006) (noting that "the fact that [defendant] was in jail does not in and of itself mean that he withdrew from the scheme").

There was ample evidence for a jury to find, as it did, that Aguirre not only remained in the conspiracy, but also actively participated in it following his arrest and imprisonment. There was testimony that Aguirre stated that the gang was his family and he would never leave it, and there was other evidence that he remained the leader of the Enfermos while in prison. Further, Henriquez's testimony and the recorded conversation between Menjivar and a confidential witness showed that Aguirre ordered the murder of Henriquez by MS-13 members while Aguirre was in prison.

At best, Aguirre's evidence tended to show a diminution in his leading and communicating with the clique, and that there were rumors that he "wanted out." Even "[m]ere cessation of activity in furtherance of the conspiracy does not constitute withdrawal," Ciresi, 697 F.3d at 27 (quoting Juodakis, 834 F.2d at 1102), and the evidence here does not show even cessation.

Aguirre's second challenge, which he raises for the first time on appeal, is that placing the burden on a defendant to

show withdrawal is "constitutionally deficient" and, further, that the government should be required to advise him of the needed steps to prove withdrawal.

At oral argument, Aguirre argued for the first time that the district court erred when it instructed the jury that the defendant had the burden to show he withdrew from the charged conspiracy. Aguirre did not cite a single case in support of his argument. Putting waiver aside, we see no error, plain or otherwise.

As to his jury instruction challenge, Aguirre doubly waived this argument because it was not made at trial and also because "arguments not raised in a party's initial brief and instead raised for the first time at oral argument are considered waived." Pizarro-Berríos, 448 F.3d at 5. Aguirre's jury instruction challenge is, in any event, meritless, as is his more general constitutional challenge to the law on withdrawal from a conspiracy. Our review of both arguments is for plain error because Aguirre did not raise either argument at trial.

When instructing the jury on what constitutes withdrawal from a conspiracy, the district court stated that "[i]t is the defendant's burden to show that he has withdrawn from the conspiracy." The district court then instructed that to show withdrawal:

[A] conspirator must act affirmatively to

either defeat or disavow the purposes of the conspiracy. Typically, that requires either a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals. A defendant cannot withdraw simply by ceasing activity in furtherance of the conspiracy or by being prevented from continuing to participate in the conspiracy.[10]

In Smith, the Supreme Court held that "[a]llocating to a defendant the burden of proving withdrawal does not violate the Due Process Clause" unless it negates an element of the crime. Smith, 568 U.S. at 110. Further, this circuit has repeatedly stated that a full confession or communication of abandonment to one's co-conspirators are typical ways for a defendant to show withdrawal, as the district court correctly instructed. See, e.g., Juodakis, 834 F.2d at 1102. For these reasons, we reject Aguirre's challenges.[11]

C. Challenges to the Admission of Testimony

  1. Allegedly False Testimony

Aguirre next argues that the government "relied on

---

[10]   His claim, made at oral argument, that the district court's instructions limited the potential mechanisms of withdrawal and so were erroneous is flatly refuted by the record.

[11]   To the extent that Aguirre argues his trial counsel was ineffective, Aguirre waives this argument for failing to develop it. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). The arguments Aguirre raises for the first time in his reply brief are waived. See United States v. Lemmerer, 277 F.3d 579, 592 (1st Cir. 2002).

inherently misleading testimony" to convict him.  Aguirre did not raise this argument in the trial court, so our review is for plain error.  Aguirre's challenge is meritless, and we find no error, much less plain error.

Prosecutors must correct testimony that they know to be false.  Napue v. Illinois, 360 U.S. 264, 269 (1959).  Here, defense counsel asked an FBI agent on cross-examination about who originated the plot to kill Henriquez.  The agent replied, "I wasn't sure if it was Big Crazy[12] or if the information we had was coming out of the prison concerning [Aguirre] making that order.  I thought we had developed information that [Aguirre] had issued the order from prison."  At the defense's request, the district court struck this answer from the record and instructed the jury to disregard it.  The agent's later testimony on redirect and on recross-examination made clear that it was his belief that Aguirre gave the order to kill Henriquez and this belief came from a recording in which Menjivar stated that Aguirre gave the order to kill Henriquez.

There was no Napue error, plain or otherwise, because the agent's first answer, itself not false, was stricken, and his admitted testimony was not false but accurately recounted the evidence.

---

[12]     Big Crazy was the gang name of the leader of a different MS-13 clique, operating in Everett, Massachusetts.

## 2. Alleged Petrozziello Error

Aguirre next argues that the admission of a recording, in which Menjivar stated that Aguirre gave the order to kill Henriquez, was error because the recording was "impermissible hearsay." The district court provisionally admitted this recording as a co-conspirator statement under Federal Rule of Evidence 801(d)(2)(E) and made a final ruling admitting the statement on the last day of trial pursuant to United States v. Petrozziello, 548 F.2d 20 (1st Cir. 1977). Because Aguirre did not "renew [his] objection at the close of evidence," Ciresi, 697 F.3d at 26-27, our review is for plain error, id. at 26.

The district court did not err. Statements made by the defendant's co-conspirators during and in furtherance of the conspiracy are not hearsay. Fed. R. Evid. 801(d)(2)(E). Here, sufficient evidence supported the district court's decision to admit the recorded statement by Menjivar: Menjivar was a member of the Enfermos, and he made this statement to an informant while discussing another Enfermos member's alleged betrayal. See United States v. Avilés-Colón, 536 F.3d 1, 15 (1st Cir. 2008) (finding admissible a statement made to a government informant if it otherwise satisfies Rule 801(d)(2)(E)).[13]

---

[13] Aguirre also argues that there was no evidence of "how" Menjivar knew this information and that the statement was "opinion." But a statement does not need to be based on personal knowledge if it otherwise satisfies Rule 801(d)(2)(E). See United

- 21 -

### 3.    Alleged Rule 403 Error

Aguirre next argues that the district court violated Rule 403 when it admitted evidence documenting two MS-13 meetings and testimony about six murders committed by MS-13 members, all of which happened after his arrest.  Aguirre objected at trial on several different grounds but did not mention Rule 403.  We nonetheless assume favorably to him that abuse of discretion applies.  See United States v. Appolon, 715 F.3d 362, 371 (1st Cir. 2013).

A district court may exclude evidence when its probative value is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403.  The district court has "especially wide latitude" in striking this balance.  United States v. Mehanna, 735 F.3d 32, 59 (1st Cir. 2013) (quoting United States v. Candelaria-Silva, 162 F.3d 698, 705 (1st Cir. 1998)).  The district court did not abuse its discretion under Rule 403.  To avoid the risk of unfair prejudice, the district court told the government at the beginning of trial to focus its evidence on Aguirre's agreement to be a part of the charged enterprise.  After the defense stated in its opening that the conspiracy was just "six kids" and implied that there was no evidence of "dead bodies," the government argued that it should be permitted to introduce

States v. Saccoccia, 58 F.3d 754, 782 (1st Cir. 1995).

- 22 -

more evidence of the wider MS-13 conspiracy.  The district court allowed the government to challenge this defense characterization, which it did with the evidence that Aguirre now challenges.  This evidence was probative in countering the defense's inaccurate characterization of the conspiracy, and it was not unfairly prejudicial to introduce these statements and acts of other MS-13 members.  We see no abuse of discretion.

Aguirre also argues that the testimony of Irwin Martinez violated Rule 403.  But at trial, the district court struck Martinez's testimony from the record and directed the jury to disregard it.  "When a limiting instruction adequately addresses any prejudice that might arise from improperly admitted evidence and the record lacks evidence that the jury disregarded the instruction, the evidentiary error is harmless."  United States v. Mangual-Santiago, 562 F.3d 411, 426 (1st Cir. 2009).  Aguirre points to no evidence that the jury disregarded this instruction, so we find no error.

D.   Double Jeopardy

Aguirre's final challenge is that the prosecution violated his right against double jeopardy because a state court tried him for what he argues was the same crime.  Gamble v. United

<u>States</u>, 139 S. Ct. 1960, 1964 (2019), forecloses this argument.[14]

Aguirre was convicted fair and square.  <u>Affirmed</u>.

---

[14]    To the extent that the defendant has made other arguments, they are unpreserved, undeveloped, meritless, or all of the above.